**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARSHELL SMOKER, )  | Civil Action No. 06-1556 |
| Plaintiff, )  | Judge McVerry |
| vs. )  | Magistrate Judge Lenihan |
| MICHAEL J. ASTRUE, )  | |
| Commissioner of )  | |
| Social Security,[1] )  | Re: Doc. Nos. 12 & 14 |
| Defendant. )  | |

## REPORT AND RECOMMENDATION

I.      RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Summary Judgment (Doc. No. 12) be granted, and Defendant's Motion for Summary Judgment (Doc. No. 14) be denied, and that the decision of the Commissioner of Social Security denying an award of disability insurance benefits and supplemental security income be vacated and remanded for further proceedings consistent with this Report and Recommendation.

II.     REPORT

A.  Procedural History

Marshell Smoker ("Plaintiff") filed an application for disability insurance benefits

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Therefore, pursuant to Fed.R.Civ.P. 25(d)(1), Michael J. Astrue is substituted for former Commissioner, Jo Anne B. Barnhart, as the Defendant in this case.

("DIB") and supplemental security income ("SSI") on April 13, 2004, claiming that she became disabled on September 1, 2001. (Tr. 79-81.) The state agency denied her application on June 7, 2004. (Tr. 44-47.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 48-49.) A hearing was held on October 11, 2005 in Latrobe, Pennsylvania before Administrative Law Judge, Patricia C. Henry. (Tr. 628-59.)

On February 24, 2006, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 23.) Specifically, the ALJ determined that the medical evidence indicated that Plaintiff "has impairments consisting of obesity, cervical and lumbar disc disease, fibromyalgia, plantar fasciitis, a depressive disorder, a panic disorder with agoraphobia, and a post traumatic stress disorder," and that these impairments are severe within the meaning of the regulations. (Tr. 15.) Because she concluded that none of these impairments was severe enough to meet or medically equal, either alone or together, one of the impairments listed in the Listing of Impairments, Appendix 1 to Subpart P of Part 404,[2] the ALJ proceeded to determine Plaintiff's Residual Functional Capacity ("RFC") for performing the requirements of her past relevant work or other work existing in significant numbers in the national economy. Weighing the evidence as a whole, the ALJ determined that although Plaintiff could not perform her past relevant work, she retained the RFC to perform sedentary work, except for work requiring the following:

> [L]ifting and carrying objects weighing more than 10 pounds, prolonged standing and walking, more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing, occasional interaction with supervisors, coworkers, or the general public, more than simple work related decisions, frequent workplace changes, the stress associated with a production or quota based work environment,

_____

[2]20 C.F.R., Pt. 404, Subpt. P, App. 1 (2005).

or the performance of other than simple, repetitive, routine, (i.e. unskilled) job tasks.

(Tr. 22, Finding No. 5.)  The ALJ concluded that, given these restrictions, jobs existed in the national economy which she could perform.  (Tr. 22-23.)

Plaintiff filed an appeal with the Appeals Council to review the ALJ's decision. (Tr. 10.)  The Appeals Council denied Plaintiff's request for review, holding that it found no reason to review the ALJ's decision, making the decision the final decision of the Commissioner of Social Security ("Commissioner").  (Tr. 6-8.)

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff filed the above-captioned Complaint on November 27, 2006, requesting review of the final decision of the Commissioner denying her claim for DIB and SSI under the Social Security Act.  (Doc. No. 4, ¶ 1.)  Plaintiff claims that the ALJ erred as follows: 1) Although the ALJ acknowledged that Plaintiff's fibromyalgia was a "severe" impairment, the ALJ erred as a matter of law in relying on the lack of "objective" evidence to deny Plaintiff's claim of disability based on fibromyalgia; 2) Although the ALJ acknowledged that Plaintiff described having severe headaches, she never discussed whether they were "severe" or "non-severe" despite the numerous references in the record documenting Plaintiff's headaches; and 3) in light of the above, the ALJ's hypothetical question to the Vocational Expert ("VE") was necessarily "inaccurate" as a matter of law because it did not incorporate all of Plaintiff's limitations.


B.  Relevant Facts

Plaintiff, Marshell L. Smoker, was 45 years of age at the time of the ALJ's

decision. She has a ninth grade education and past work experience as a cashier, spot welder, assembler, and housekeeper. (Tr. 15.)

On September 17, 2002, Plaintiff was examined by Dr. Michael Rutigliano. (Tr. 343.) This one-page report describes a one-time consultative meeting for neck and low back pain. Dr. Rutigliano referenced a September 2, 2001 motor vehicle accident in which Plaintiff was an unrestrained passenger. He noted that since the time of the accident, she has experienced posterior cervical headaches, neck pain, and low back pain. She described shooting pain into both arms and legs which was unresolved by both chiropractic care and physical therapy. His findings revealed the following:

> Her neurologic examination including motor, sensory, and reflex testing is normal. Her cranial nerve testing is also normal throughout. Gait examination including toe, heel, and tandem walking is intact. Range of motion of the low back is somewhat reduced secondary to discomfort and muscle tightness. She has mild paraspinous spasm to palpation. Range of motion of the neck is relatively full without significant paraspinous spasm.

(Tr. 343.)

Dr. Rich Kozakiewicz, with Pennsylvania Physical Medicine, Inc., performed an electrodiagnostic study of Plaintiff on November 17, 2003. (Tr. 360-61.) His Summary/Interpretation of motor nerve, sensory nerve, F-Wave, and EMG study results indicated the following: "Normal study, including no evidence of peripheral polyneuropathy, CTS, or radiculopathy." (Tr. 361.)

In 2004, Plaintiff's primary care physician, Dr. Daniel B. DiCola, documented Plaintiff's Fibromyalgia, including numerous pain trigger points on her back, shoulder, hips and on both sides of her diaphragm, indicating that these trigger points were typical of fibromyalgia.

(Tr. 376-77, 388).  Treating records from this time also document depression with "all over body pain," and fibromyalgia with several trigger points.  (Tr. 389.)  Follow up records again reflect complaints of pain from fibromalgia including the reporting of multiple trigger points, referencing areas above and below the diaphram.  (Tr. 390.)  In June 2004, Dr. DiCola indicated that he is "convinced from exam and symptoms that this [fibromyalgia] is what she has."  (Tr. 391.)  Also at this time, Dr. DiCola reported Plaintiff's complaints as "whole body pain" including "head, arms, legs, and back."  (Tr. 382.)  He also reported that she continues to have abdominal spasms, and he opines that she "most likely has IBS [irritable bowel syndrome] associated with her fibromyalgia."  (Tr. 382.)  He further indicated that "she is probably developing chronic pain syndrome."  (Tr. 382.)  He prescribed Librax for abdominal spasms, and continued Neurontin for fibromyalgia.  (Tr. 382.)

In early 2005, Plaintiff reported to Latrobe Area Hospital for a Primary Care Interval Office Visit, wherein she complained of "feeling shakey" and "anxious" and expressed concern about returning to work with pain relating to her fibromyalgia.  (Tr. 434.)  The notes indicate that she had contemplated suicide.  (Tr. 434.)  A February 18, 2005 Psychiatric Re-evaluation Report described Plaintiff, in part, as follows:

> The patient is a 44-year-old white, married female, mother of two children ages 26 and 23, out of the home. . . .  Her major problem and chief complaint is that she has very severe chronic pain, which has led to a lot of depression.  She also has fibromyalgia and symptoms compatible with a panic disorder.  This is a woman who was very high functioning up until about two to three years ago.  She began to develop pain in the low back area.  She was diagnosed with disc disease in the lumbar area and also fibromyalgia was diagnosed.  Then she had a car accident in 2002, which made all of the symptoms worse.  Prior to that, she denies any significant depression.  She sees Dr. DiCola and her current meds include the following: Neutrontin 300mg. t.i.d.; Effexor XR 75 mg. b.i.d.; Sulindac 200 mg. b.i.d., and she is getting no relief with her pain.  She was tearful throughout the

5

entire interview.  She was obviously extremely uncomfortable because of back pain, and she has become very frustrated, depressed and even suicidal.

(Tr. 522.)  Dr. J. Stephen Carter, the author of the report, assigned her a GAF of 40, and cautioned her that "until the pain was in better control, no antidepressant would be effective." (Tr. 523.)

Plaintiff was seen in the Emergency Department of Latrobe Area Hospital on March 5, 2005 with complaints of body pain.  (Tr. 479-483.)  The notes from this visit indicate that Plaintiff hurt all over, she was not sleeping or eating, and that she was tender everywhere. (Tr. 480.)  The relevant nursing assessment lists fibromyalgia, migraines and insomnia; other history indicates all over body aching, and that she was unable to sleep due to pain.  (Tr. 482.) Plaintiff stated : "I'm tired of hurting and if someone doesn't help me I'm going to end it all." (Tr. 482.)  Subsequent notations indicate that Plaintiff was crying and swaying back and forth. (Tr. 482.)  A March 22, 2005 Medication Management/Psychiatric Evaluation Review form reflects that Plaintiff stated she is not sleeping because of the pain, and that she is having difficulty functioning.  (Tr. 520.)  On March 28, 2005, Plaintiff again returned for a check up and complained that her "body hurts."  (Tr. 433.)  Dosage for her fibromyalgia medication (Neurontin) was increased.  (Tr. 433.)

During her May 2005, Primary Care Interval Office Visit, Plaintiff reported that "Body still hurts.  Legs weak."  (Tr. 432.)  On May 20, 2004, Dr. Douglas E. Klions examined Plaintiff "after she developed a sudden onset of epigastric and right upper quadrant pain which doubled her over."  (Tr. 383.)  Two days later, she arrived at the Latrobe Area Hospital Emergency Room as the pain had not improved.  Dr. Klions noted her history of fibromyalgia

and depression and described her "[e]xtremities without cyanosis, clubbing or edema." (Tr. 383.)

On June 8, 2005, Plaintiff was admitted to the Latrobe Area Hospital Emergency Room with complaints of migraine headaches, and photosensitivity was noted. (Tr. 473-76.)

Plaintiff's July 13, 2005 Interval Office Visit notes reflect the following:

> Muscle spasms, and pain episodes, "charley horse" pain all over body, tender extremities, abdomen, back near slipped disc, occurs more at night, depressive symptoms–crying, suicidal ideation with specific plan in past but no current plan, anxiety, confused episodes, prev. ear infection still painful, alternating constipation and diarrhea with abdominal pain.

(Tr. 430.)

Plaintiff's July 21, 2005 Primary Care Interval Office Visit notes reflect that she was seen in the Emergency Room the night before, and that her chief complaints were of headaches and joint pain. (Tr. 429.) Documentation for this July 20, 2005 Emergency Room visit confirm that her chief complaints were back pain, headaches and pain from "top of head down to feet." (Tr. 466-69.) In August 2005, Plaintiff was again admitted to the Latrobe Area Hospital Emergency Room complaining of sharp, intermittent, entire back pain; physician assessment indicated fibromyalgia and depression. (Tr. 460–62.)

Additional medical evidence documenting Plaintiff's complaint of headaches exists throughout the record. She reported severe headaches in February, 2002. (Tr. 356.) She again reported problems with headaches in October 2003. (Tr. 380.) In September, and October 2004, she was admitted to Latrobe Area Hospital with chief complaints of headache and ear pain. (Tr. 407, 400.) Emergency Department notes from Plaintiff's October 25, 2004 admission for headaches indicate that Plaintiff also had pain relating to her fibromyalgia, especially in both legs and right arm. (Tr. 516.) She further indicated that she was taking Tylenol but that it was not

helping.  (Tr. 518.)  She described her pain as the most severe - a 10 out of 10 rating.  (Tr. 518.)

At the hearing on October 11, 2005, Plaintiff testified that she left her last job as a prep and  baker at Eat-N-Park because she could no longer do any aspects of the job, including the standing and bending.  (Tr. 637.)  She had to be taken to the hospital from the workplace due to severe pain all over her body.  (Tr. 637.)  She generally obtained relief from pain by going to the Emergency Room, especially when her medications do not control the pain.  (Tr. 639.)  She testified that nothing in particular triggers the pain; she wakes every morning with headaches and severe pain.  (Tr. 639.)  She further testified that one of the side effects that she experiences from her medications is confusion: "I don't know where I'm at."  (Tr. 642.)  She has experienced this side effect four times in the span of one month.  Consequently, she doesn't drive because of this particular side effect.  (Tr. 642.)  She is able to do some dusting, but too much sweeping and vacuuming causes pains to shoot down her arms; she has a lot of pain in her arms and legs.  (Tr. 644.)  She can do things around the house for about 20 minutes before the pain begins.  (Tr. 652.)  The friend she lives with helps her a lot with the housework.  She has a difficult time even standing at the sink for any more than short periods of time.  (Tr. 644.)  During a typical day, she may go to the church for maybe an hour twice a week, and do some dusting and laundry if her friend brings the laundry down to her.  She doesn't watch much television and does not work on a computer as it exacerbates her headaches.  (Tr. 645.)  She does not pay the bills.  (Tr. 646.)  She does not go to the grocery store.  (Tr. 647.)  She has difficulty walking for any considerable distance as she experiences pain in her lower back and neck.  (Tr. 647.)  Plaintiff indicated that it is her pain and panic attacks that she finds most limiting in her ability to work and do things.  She has tried therapy, and hot baths, but nothing seems to work.  (Tr. 649.)  She attempts to

minimize the pain by staying off her legs.  She will lie down about twice a day for about a half an hour each time.  Often, staying off her feet does not help the pain.  (Tr. 649.)  She has tried to relieve the pain with heat as well.  (Tr. 650.)  She has headaches everyday and can only get relief by going to the Emergency Room at the Latrobe Area Hospital.  She testified that they give her shots to relieve the pain.  (Tr. 651.)  She has difficulty sleeping due to the pain.  (Tr. 652.)

Next, the ALJ posed the following hypothetical question to the vocational expert ("VE"):

> Assume a hypothetical individual with the claimant's education, training, and work experience who is limited to light work but is also limited to occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling, and climbing, who is limited to simple routine repetitive tasks not performed in a production or quota based environment involving only simple work related decisions and, in general, relatively few workplace changes and is limited to occasional interaction with supervisors, co-workers, and the general public.  Was is[sic], are there jobs in the national and local economy that a person with those limitations could perform?

(Tr. 655.)  The VE responded with the following jobs: house cleaner, laundry worker, and kitchen worker.  The ALJ asked the VE to assume the same hypothetical, but assume a person could only work at a sedentary position.  The VE responded with the following jobs: alarm monitor, hand packer, and order clerk.  The VE also testified that only three absences would be tolerated a month, and only three rest breaks per day.  If more absences or breaks were taken, that would affect the availability of these jobs for the individual.  (Tr. 657.)

## C. Standard of Review

In reviewing an administrative determination of the Commissioner, the question

before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner. 42 U.S.C. § 405(g). See also, e.g., Richardson v. Perales, 402 U.S. 389 (1971); Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994). More specifically, 42 U.S.C. § 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ..

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999). Although there may be contradictory evidence in the record, and/or although this Court may have found otherwise, it is not cause for remand or reversal of the Commissioner's decision if substantial support exists. Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

The United States Court of Appeals for the Third Circuit has noted that evidence is not substantial "if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) (citation omitted); see also Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986) (citing Kent, 710 F.2d at 114). In addition, despite the deference due to administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Finally,

the "grounds upon which an administrative order must be judged are those upon which the record

discloses that its action was based." Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001)

(quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).


D.    Disability Evaluation

The issue before the Court is whether there is substantial evidence to support the findings of

the Commissioner that Plaintiff was not disabled within the meaning of the Act, but had the residual

capacity to perform a form of substantial gainful employment.

The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months . . .

The requirements for a disability determination are provided in 42 U.S.C. § 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his
> physical or mental impairment or impairments are of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.  For
> purposes of the preceding sentence … "work which exists in the
> national economy" means work which exists in significant numbers
> either in the region where such individual lives or in several regions
> of the country.

A "physical or mental impairment" is "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).[3]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability. The regulations, published at 20 C.F.R. §§ 404, 1501-29, set forth an orderly and logical sequential process for evaluating all disability claims.[4] In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity. If not, then the severity of the Plaintiff's impairment must be considered. If the impairment is severe, then it must be determined whether she meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairment does not meet or equal the Listings, then it must be ascertained whether Plaintiff can do her past relevant work. If not, then the residual functional capacity ("RFC") of the plaintiff must be ascertained, considering all the medical evidence in the file to assess

---

[3]In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence. See Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"); Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.") (citations omitted).

In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of her daily activities. See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review discussed in Section C, supra. See Good v. Weinberger, 389 F. Supp. 350, 353 (W.D. Pa. 1975) (discussing Bittel, 441 F.2d at 1195, and concluding that where "[p]laintiff did not satisfy the fact finder in this regard, so long as proper criteria were used, [it] is not for us to question."); see also Kephart v. Richardson, 505 F.2d 1085, 1089 (3d Cir. 1974) (noting that credibility determinations of ALJ are entitled to deference).

[4]This evaluation process has been reiterated with approval by the United States Supreme Court. See, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003).

whether the Plaintiff has the ability to perform other work existing in the national economy in light of the Plaintiff's age, education, and past work experience. [5]

The finding of the ALJ that Plaintiff is unable to perform her past relevant work will satisfy Plaintiff's burden. Thereafter, the burden shifts to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates her residual functional capacity. See 20 CFR § 404.1520; Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).[6] Thus, it must be determined whether there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Social Security Act.

### E. Analysis

1. Denial of Plaintiff's Disability Claim based on Fibromyalgia.

Plaintiff first argues that "[t]he ALJ erred as a matter of law by relying on the lack of 'objective' evidence to deny [P]laintiff's claim of disability based on fibromyalgia."

---

[5]The finding of residual functional capacity is the key to the remainder of findings under the regulations. If the plaintiff's impairment is exertional only, (i.e. one which limits the strength she can exert in engaging in work activity), and if her impairment enables her to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made. If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts. See 20 C.F.R. § 404.1569; 20 C.F.R. pt. 404, subpt. P, app., § 200.00(a).

[6]The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert. See Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs., 48 F.3d 114, 121 (3d Cir. 1995).

(Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 13 at 7.)  Defendant

counters that "[t]he ALJ went deeper into Plaintiff's condition than the diagnostic test results and

a handful of clinical findings, considering the signs and symptoms that are often found in

individuals who are disabled."  (Defendant's Brief in Support of his Motion for Summary

Judgment, Doc. No. 15 at 11) (citing ALJ's Decision, Tr. 19).  That is, Defendant points to the

ALJ's statement that the record is "devoid of any evidence showing a significant degree of

muscle atrophy, a motor sensory loss, reflex abnormality, or significant reduced range of motion

of the spine or joints."  (Defendant's Brief in Support of his Motion for Summary Judgment,

Doc. No. 15 at 11.)

 After finding that Plaintiff's fibromyalgia is a severe impairment, the ALJ relies

on the following reasoning to support her conclusion that Plaintiff's fibromyalgia singly, or in

combination with other impairments, does not meet or equal any of the criteria set forth in the

Listings:

> [T]he medical evidence does not contain the objective signs,
> symptoms, or findings or the degree of functional limitations
> necessary to meet or equal the severity of any subsection of the
> above mentioned listings.  Indeed, a physical examination in
> September 2002 by Dr. Michael J. Rutigliano, a neurological
> surgeon, revealed an intact gait, including toe, heel, and tandem
> walking, with no motor, sensory, or reflex abnormalities.
> Moreover, an electrodiagnostic study in November 2003 was
> normal with no evidence of peripheral polyneuopathy, carpal
> tunnel syndrome, or radiculopathy.

(ALJ's Decision, Tr. 15) (internal citations omitted).

 Thereafter, at step four of the five-step sequential analysis, the ALJ again relies on

the above medical evidence and the May 2004 physical examination by Dr. Klions which

"revealed no cyanosis, clubbing, or edema of the extremities notwithstanding the [Plaintiff's]

allegations of chronic joint pain." (Tr.16) (internal citations omitted). In considering Plaintiff's

subjective complaints in accordance with Social Security Regulations 404.1529 and 416.929, and

Social Security Ruling ("SSR") 96-7p, the ALJ concludes that Plaintiff's "statements concerning

the intensity, duration, and limiting effects of these symptoms are not entirely credible." (Tr. 18.)

The ALJ notes more specifically that Plaintiff's subjective complaints include "chronic neck,

back, and joint/muscle pain headaches, and abdominal pain," and further notes that Plaintiff has

"indicated she is unable to lift and carry heavy objects or to sit, stand, and walk for prolonged

periods of time due to her discomfort." (Tr. 18.) The ALJ discounts Plaintiff's complaints by

again referencing the absence of supporting objective medical evidence as follows:

> [T]he clinical and objective findings are inconsistent with an
> individual experiencing totally debilitating symptomatology. The
> record is devoid of any evidence showing a significant degree of
> muscle atrophy, a motor or sensory loss, reflex abnormality, or
> significant reduced range of motion of the spine or joints.

(Tr. 19) (emphasis added). The ALJ again references the September 2002 examination

by Dr. Rutigliano, and the electrodiagnostic study in November 2003. (Tr. 19.)

Finally, in her discussion concerning activities of daily living, the ALJ again notes

that although Plaintiff represents that she requires assistance from friends to perform most

household chores and activities, "there if no evidence of any significant disuse muscle atrophy of

the extremities on physical examination which suggests the [Plaintiff] moves about on a fairly

regular basis and that she performs more activities than reported." (Tr. 19.)

The record establishes and the ALJ concedes that Plaintiff suffers from

fibromyalgia,[7] a severe impairment under the regulations.  The  diagnosis of fibromyalgia is

based on the classification criteria developed by the American College of Rheumatology

("ACR") in 1990 and includes two aspects: (1) a history of widespread pain in all four quadrants

of the body for a minimum duration of three months; and (2) at least 11 of the 18 specified tender

points which cluster around the neck, shoulder, chest, hip, knee, and elbow regions. [8]      Several

district courts in this Circuit have found reversible error where the claimant suffers from

fibromyalgia and the ALJ rejects claimant's allegations of pain because the ALJ found no

support from objective medical testing.  Foley v. Barnhart, 432 F. Supp.2d 465, 480 (M.D. Pa.

2005) (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (holding "in a

disability determination involving fibromyalgia, it is error to require objective findings when the

disease itself eludes such measurement"); Perl v. Barnhart, No. 03-4580, 2005 WL 579879, * 5

(E.D. Pa. Mar. 10, 2005) (citing Jusino v. Barnhart, No. 01-4902, 2002 WL 31371988, at *7

---

[7](Tr. 15.)

[8]SSA has recognized fibromyalgia as a medically determinable impairment where certain "signs" are clinically established by the medical record.  Susan M. Daniels, Ph.D., Social Security Memorandum: Fibromyalgia, Chronic Fatigue Syndrome Objective Medical Evidence Requirements for Disability Adjudication (May 11, 1998), *available at* http://www.myalgia.com/SSA%20memorandem%20on%20FM.htm) ("Social Security Memorandum").  Citing the American College of Rheumatology ("ACR"), the SSA explained:

> The signs primarily are the tender points.  The ACR defines the disorder in patients as "widespread pain in all four quadrants of the body for a minimum duration of 3 months and at least 11 of the 18 specified tender points which cluster around the neck and shoulder, chest, hip, knee, and elbow regions."  Other typical symptoms, some of which can be signs if they have been clinically documented over time, are irritable bowel syndrome, chronic headaches, temporomandibular joint dysfunction, sleep disorder, severe fatigue, and cognitive dysfunction.

(E.D. Pa. Oct. 21, 2002); Alvarado v. Chater, No. 96-2710, 1997 WL 43008, at *3 (E.D. Pa. Jan. 24, 1997)).  A methodology which relies on the presence or absence of physiological medical tests to confirm a claimant's impairment in determining her RFC ignores the reality of fibromyalgia and the diagnostic technique employed to objectively determine the existence and severity of fibromyalgia, i.e., tender point evaluation and clinical documentation of a claimant's symptoms by treating physicians.  Perl, 2005 WL 579879, at *5 (citing Preston v. Sec'y of Health & Human Serv., 854 F.2d 815, 817-18 (6th Cir. 1988); Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996); SSR 96-4p at n.2 (July 2, 1996);  Social Security Memorandum, supra).  Stated another way, unverified subjective complaints consistent with fibromyalgia cannot be discredited due to lack of objective evidence.  Foley, 432 F. Supp.2d at 480 (citing Green-Younger, 335 F.3d at 108).  "Rather, a doctor's diagnosis of fibromyalgia bolsters the credibility of the plaintiff's complaints."  Id.  (citing Green-Younger, 335 F.3d at 108).

This is precisely the type of analysis undertaken by the ALJ.  When performing her analysis pursuant to Social Security Ruling 96-7p regarding Plaintiff's subjective complaints of pain, the ALJ specifically stated that the "clinical and objective findings are inconsistent with an individual experiencing totally debilitating symptomatology."  (Tr. 19.)  And as emphasized by Defendant in his supporting brief, the ALJ specifically stated that the record was "devoid of any evidence showing a significant degree of muscle atrophy, a motor or sensory loss, reflex abnormality, or significant reduced range of motion of the spine or joints."  (Defendant's Brief in Support of His Motion for Summary Judgment, Doc. No. 15 at 11) (citing Tr. 19).  Courts have repeatedly rejected this reasoning with regard to fibromyalgia.  See Lisa v. Sec'y of the Dept. of Health and Human Servs., 940 F.2d 40, 45 (2d Cir.1991), quoted in, Green-Younger, 335 F.3d at

108-09 ("In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results - a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions."); see also Brown v. Barnhart, 182 Fed. Appx. 771, 774 (10th Cir. 2006) ("[M]uscle strength and a lack of results from objective laboratory tests for the presence or severity of fibromyalgia do not rule out the possible existence of the condition.").

The ALJ's reliance on the lack of objective medical evidence of Plaintiff's fibromyalgia hindered her analysis at steps three and four of the five-step sequential analysis. The ALJ discounted Plaintiff's subjective complaints in the absence of objective clinical findings when determining Plaintiff's residual functional capacity. Further, the ALJ relied on the absence of objective clinical findings in determining whether Plaintiff's severe fibromyalgia, alone or in combination with other impairments, met or medically equaled the Listings. Accordingly, the Court recommends that this case be remanded to the ALJ for a proper analysis at steps three and four in light of the controlling case law. On remand, the ALJ must consider and evaluate all of Plaintiff's subjective complaints, and their effect on her ability to perform other relevant work. Further, the ALJ must consider all medical record evidence, including records of Plaintiff's treating physicians. In conducting this evaluation, the ALJ may want to further develop the record by requesting either Plaintiff's treating physicians, or a rheumatologist to complete a Fibromyalgia Residual Functional Capacity Questionnaire, to assist her with determining Plaintiff's RFC in light of her subjective complaints.

        2.      ALJ's Failure to Perform a Step Two Analysis as to Plaintiff's

<u>Headaches</u>

Plaintiff next contends that the ALJ erred when she failed to conduct a step two analysis with regard to record medical evidence of Plaintiff's headaches. Plaintiff indicates that the ALJ referenced only a normal CT finding in dismissing Plaintiff's testimony regarding the impact of these headaches on Plaintiff's functioning at step four. Defendant only responds that the record evidence demonstrates that the headaches were not severe. Defendant does not address the absence of a step two analysis in the ALJ's decision regarding Plaintiff's headaches, and the subsequent consideration of Plaintiff's normal CT scan at step four in discounting her subjective complaints of headache pain.

As discussed above, the applicable regulations set forth an explicit five-step evaluation to determine disability. 20 C.F.R. §§ 404, 1501-29 set forth the orderly and logical sequential process for evaluating disability claims. Only if the ALJ determines that a claimant's impairment is severe, may she then continue with the remainder of the five-step sequential evaluation. Here, the ALJ neglected to perform a step two analysis regarding Plaintiff's headaches. The step two inquiry has been described as a <u>de minimus</u> screening device used to dispose of groundless claims. <u>Newell v. Commissioner of Social Security</u>, 347 F.3d 541, 545 (3d Cir. 2003). The United States Court of Appeals for the Third Circuit in <u>Newell</u> provided more detail as to the step two analysis as follows:

> An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have "no more than a minimal effect on an individual's ability to work." Only those claimants with slight abnormalities that do not significantly limit any "basic work activity" can be denied benefits at step two. If the evidence presented by the claimant presents more than a "slight

abnormality," the step-two requirement of "severe" is met, and the sequential evaluation process should continue. Reasonable doubts on severity are to be resolved in favor of the claimant.

Id. at 546-47 (internal citations omitted).

Here, the record medical evidence repeatedly describes Plaintiff's difficulties with headaches and her attempts to find relief in the Emergency Department of Latrobe Area Hospital. Yet, the ALJ fails to make a finding at step two, one way or another, as to whether Plaintiff's headaches are severe. She only mentions them again when referencing a normal CT finding at step four in discounting Plaintiff's subjective complaints of headache pain. Clearly, the ALJ has failed to follow the five-step sequential process for evaluating all disability claims published at 20 C.F.R. §§ 404, 1501-29.[9] Consequently, it is recommended that this case be remanded so that the ALJ may properly conduct a step two analysis relating to Plaintiff's headaches. If, after considering all record evidence relating to Plaintiff's headaches, she determines that the headaches are severe, she should continue with the remainder of the five-step analysis as described in the regulations.

3.     The ALJ's Hypothetical Question to the Vocational Expert

Plaintiff contends that the ALJ improperly based his opinion of non-disability on

---

[9]In his Brief in Support of His Motion for Summary Judgment, Defendant argues that the record medical evidence demonstrates that Plaintiff's headaches are not severe and therefore, the ALJ's decision is supported by substantial evidence. (Defendant's Brief in Support of His Motion for Summary Judgment, Doc. No. 15 at 12-14.) Defendant cannot provide the analysis that the ALJ failed to perform in his decision, and then argue that the ALJ's decision is supported by substantial evidence. Foley v. Barnhart, 432 F. Supp. 2d 465, 477 (M.D. Pa. 2005) (citing Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001)) (holding the Commissioner's after-the-fact analysis in her brief on appeal cannot substitute for the ALJ's missing analysis).

the vocational expert's testimony. That is, Plaintiff argues that the expert's testimony was flawed because the hypothetical question upon which it was based did not include all of Plaintiff's limitations relating to her fibromyalgia and headaches. In particular, Plaintiff contends that her limitations relating to her fibromyalgia and headaches would require her to take "repeated breaks during the normal work day, exceeding the normal 15 to 20 minute break in the morning and afternoon and the 30 to 60 minute lunch break allowed by employers, and the repeated inability to report to work." (Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 13 at 20) (footnote omitted).

The United States Court of Appeals for the Third Circuit has held that "a hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984); Wallace v. Secretary, 722 F.2d 1150 (3d Cir. 1983)). See also Plummer v. Apfel, 186 F.3d 422, 431-32 (3d Cir. 1999) (applying Chrupcala to conclude that the VE's testimony could be relied upon as substantial evidence that the plaintiff was not totally disabled where the hypothetical question fairly set forth every credible limitation established by the evidence).

Because the Court has determined that this case must be remanded to the ALJ for consideration of Plaintiff's fibromyalgia and headaches, the Court does not reach the question of whether the ALJ's determination at step-five was supported by substantial evidence. Nonetheless, the Court instructs that if the ALJ reaches step-five again on remand, that any hypothetical posed to the VE must include all limitations caused by Plaintiff's fibromyalgia,

obesity, cervical and lumbar disc disease, plantar fasciitis, a depressive disorder, a panic disorder

with agoraphobia, a post traumatic stress disorder, and possibly, severe headaches, that are

supported by the record.

III.    <u>CONCLUSION</u>

For the reasons discussed above, it is recommended that Plaintiff's Motion for

Summary Judgment (Doc. No. 12) be granted, and Defendant's Motion for Summary Judgment

(Doc. No. 14) be denied, and that the  decision of the Commissioner be vacated and remanded

for further proceedings consistent with this Report and Recommendation.

In accordance with the Magistrate Judge's Act, 28 U.S.C.  § 636(b)(1)(B) and (C),

and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10)

days from the date of service to file objections to this Report and Recommendation.  Any party

opposing the objections shall have ten (10) days from the date of service of objections to respond

thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: March 12, 2008                          s/Lisa Pupo Lenihan
                                               LISA PUPO LENIHAN
                                               United States Magistrate Judge

cc: The Honorable Terrence F. McVerry
United States District Judge

All Counsel of Record
Via Electronic Mail